UNITED STATES DISTRICT COURT

FOR THE

EASTERN DISTRICT OF PHILADELPHIA

| Case No.: **5:18-cv-5655**

**NOBLE DREW ALI, et al**

        *Plaintiff,*

*vs*

**MARY MONGIOVI SPONAUGLE, et al**

        *Defendant,*

**NOTICE OF WRIT OF PROHIBITION, OBJECTION TO MOTION OF DISMISAL**

## NOTICE OF
### WRIT OF PROHIBITATION, OBJECTION TO MOTION OF DISMISAL FROM OPPOSING COUNSEL WHO HAS FAILED TO FOLLOW MANADORY INITIAL RULE PARAGRAH (2) OF PROCEDUR ORDER.

Comes now in special appearance not in subjection to this court; however to clear a

matter up. I Sheik C. Barnes Bey Sui Juris, Governor, Magistrate and Divine Minister, Disciple

in trust for The Most Holy Prophet Noble Drew Ali Moorish Prince, Successors and heirs in trust

in (Shackamaxon 41.2033° N, 77 1945° W also known as Pennsylvania), a Jural Religious

Society in the Moorish Divine and National Movement of the Moorish Science Temple of

America, a corporate body politic (State within a State) and Adept Moorish Legal Consul

Representative.

## SUBSTATIVE POINT 1 OBJECTION: TO PREMATURE MOTION TO DISMISS, DEFENDANTS VIOLATED INITIAL PRODEDURE ORDER

1) Whereas claimant object to the Motion to Dismiss and want the motion to be inadmissible because opposing Counsel Martha Gale, who is representing defendants Mary Sponaugle, David Miller and Howard Knisely and defense attorney David J MacMain and his defendants, are in direct violation of paragraph (2). **Mandatory Conferencing That Must Be Held before Any Motion is filed**

"*Before any motion is filed- including motions under Federal Rule of Civil Procedure 12 and 56 including motions to dismiss under rule 12(b)(6),- counsel must contact opposing representative to discuss thoroughly the substance of the contemplated motion and any potential resolution of it The Conference must take place at least five (5) days before the motion is filed.*"

The Counsels of the defendants did not contact Noble Drew Ali disciple in Trust Sheik C. Barnes Bey on any occasion to discuss or go over any aspect of their concerns prior to filing their Motion which is a direct violation of the order Rule 5(B) other instructions were given in this preceding. An envelope was sent to every defendant ( see Annexed) , that included: Prepaid postage, Letter outlined in Rule 4,( 2) Waivers of Summons Form, Complaint and Notice of Affidavit to Remove to Federal Court Pursuant to F.C.R.P Rule 4 Request Notice of a Lawsuit and Request to Waive Service of Summons by way of United States Republic Postal Service Certified Mail Article : (A)7017 0190 0000 5386 7378,  Postal Service Certified Mail Article : **(B) 7017 0190 0000 5386 8313** ,  Return Receipt Article : **(B) 9590 9402 4303 8190 6749 02** and Postal Service Certified Mail Article : **7017 0190 0000 5386 7385** Return Receipt Article : **(B) 9590 9402 1191 8190 5246 9501 22  (B)** Postal Service Certified Mail Article : **7017 0190 0000 5386 7415** Return Receipt Article : **(D) 9590 9402 1191 8190 5246 9501 46**  ( See Annexed **Articles A, B, C and D). to all Defendants( see Annexed :A). This Claimant objects to the defendant counsels motions and request the court to strike motion and instruct defense counsel to stay within the guide lines of the initial procedural order.**

## SUBSTANTIVE POINT 2 SUBJECT MATTER JURISDICTION AND STATED CLAIM.

Lower courts do not have subject matter jurisdiction when it involves constitutional question Amendment 1 Freedom of Religion and Article 6 Section 1 Clause 2 Supremacy Clause

of the Constitution. Which states, the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. The Moorish Science Temple of America adopted and Name Moorish Science Temple No.16 has its own autonomous Government structure  Local Bodies Religious Societies parallel Asiatic States in every State throughout these United States of America, The Grand Body Governors, Chief Heads of State(Delegates from every Asiatic State , who are to report every year to the Meccca in the West Chicago Illinois for our Constitution Conference October the 15 – 21, to propose bills and make laws for our Theocratic Government and the Supreme Grand Body( Our Supreme Court who interprets our laws) which is our three branches of Government The veracity of the courts have held that when Religious Societies decide disputes related to *"their own rules and regulations for internal discipline and government, the Constitution requires that civil courts accept their decisions as binding upon them"* **Fratello v. Archdiocese of N.Y. 863 F.3d 190 (2d Cir. 2017).** The courts have held that our Religious Society doctrines holds equal force and civil law cannot break its veil "the church autonomy doctrine "*applies with equal force to church disputes over church polity and church administration."* **Doe v.First Presbyterian Church U.S.A. of Tulsa SUPREME COURT OF THE STATE OF OKLAHOMAFeb 22, 2017Case Number: 115182 (Okla. 2017) Case Number: 115182.** The courts to futher notice that Religious Societies was first in the federal court and not the state court prior to the 14th being applied to state matters.  By virtue of our religious doctrine from our Most Holy and Divine Prophet Noble Drew Ali, that the 14th and 15th amendment is not to be applied to us since the constitution of 1774 declares all men free and since all men are there there is no need fot the application. "Since **Watson predated Erie R. Co. v. Tompkins, 304 U.S. 64 (1938),** *it was based on general federal law rather than the state law of the forum in which it was brought*." **Serbian Orthodox Diocese v. Milivojevich 426 U.S. 696, 698 (1976)**

The courts state that civil courts want of jurisdiction does not exceed the highest authority of the Ecclesiastical hierarchy  **"[T]he rule of action which should govern the civil courts . . . is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." Id., at 727.** Our deep entrenched doctrines inform

us that we are descendants of Morocco Jus sanguine and born in America Jus soli, That our Nationality is Moorish-American. The title that we give our ruler in Morocco is Sultan. Thus we are True American Citizens and party to the Free National Federal Constitution titles Public Statutes at Large of the United States of America Organization of a Government in 1789, to 1845 Attached to this is the Declaration of Independence, the Articles of Confederation, the Constitution of the United States and the Treat of Peace and Friendship articles 20 and Articles 21, Title 22 sections 142 Consular Courts and Section 143 General Jurisdiction in all Civil cases. Foreign Relations and Intercourse page 954, Supremacy Clause forbids the exclusive providence of the federal government, which state may not. The Immunities Clause of the IV Article of the Constitution renders unconstitutional a State Statute or action which discriminates on a matter of fundamental interest in favor of the state's own citizens and against citizens of other states. We feel that we have stated our case in favor of United States District Court having original jurisdiction in this claim because the State is not sovereign over this Claimant, as a Grand Sheik and Governor of the Moorish science Temple I have Been Risen to Sovereign Power Section 1: Authority of the Grand Sheik:"O thou, the favorite of heaven, whom the sons o men, thy equals, have agreed to raise to sovereign power and set as a ruler over themselves, consider the ends the importance of their trust, far more than the dignity and height of thy station. Section 2. Thou art clothed in purple, and seated on a throne; the crown of majesty investeth thy temples, the scepter of power is placed in thy hand; but not for thyself were these ensigns given (Moorish American Flag and the American Flag) not meant for thy own, but for the good of thy kingdom The glory of the King is the welfare of his people; his power and dominion rest on the hearts of his subjects". **Article 39 Section 1-3 Grand Advisor and Moderator rules and regulations.** Authority of the Grand Governor " *He palnteth new colonies (New Temples), he buildeth strong ships (Make Sheiks and Adepts and strong laymembers) he open openeth rivers for convenience (Transportation and Commerce within our Islamic communities) , he formeth harbors and safety( Shelter for the Asiatic State), his people abound for riches, and the strength of his kingdom increaseth. " He frameth his statutes with equity and wisdom( framing local and state laws for our religious society with the assistance of the Assistant Grand Sheik, Chairman , the Most Holy Prophet and the Grand Body of the MSTof A".* **Article 39 Section 11-12 Grand Advisor and Moderator rules and regulations.** When it comes to 1st Amendment of religious

freedom the civil courts must take a position of neutrality if it does not endanger the public or damage property. " Manifestly, this difference in doctrine, based on interpretation of certain New Testament scriptures, is a matter of religious belief, wholly outside the jurisdiction of civil courts. Courts cannot interpret the scriptures. Religious beliefs are of the essence of religious freedom.

## SUBSTANTIVE POINT 3: OUR AUTHORITY AND NATION STATE ISLAMIC LAW, WHO WE ARE(See Annexd )

### 1) OUR AUTHORITY

We organized as the Moorish Science Temple America in the year 1925, and were legally incorporated as a civic organization under the laws of the State of Illinois, November 1926, during the time when the states retained sovereignty, established before the "New Deal" of 1933 under President Franklin Delano Roosevelt and the 501c3 under President Lyndon Baines Johnson. Therefore, the "Moorish Temple of Science  had  its own jurisdiction as a sub division of the City of Chicago **(private sector), Certificate of Corporation #10580, known as the Charter**(Which hangs on the wall of every subordinate, religious societies  of the Grand Major Temple). In May 2, 1928, as a special meeting was called by July 20th 1928, the first Governors / Sheiks of the Temples (the Supreme Grand Council) were named as the new board of directors for the now Moorish Science Temple Of America. On August 1, 1928 at 2:52 P.M. the affidavit known as **our Authority or form 1099** was filed in the County Clerk's office as notification of the reorganizing of the Temple (forced to make change) changing it's status from a civic organization to a religious organization (on paper) this was in accordance with the legal requirements of the Secretary of the State of Illinois".

### 2) FREE NATIONAL GOVERNMENT (NATION STATE)

Our civic organization was no longer under the laws of the secretary of state it was now granted the authority to resurrect as a nation by an Act of Illinois Congress, the Moorish Nation was resurrected through Illinois legislature under the Hurds Revised Statutes of  1872 now known as R.C.A 805 ILCS An Act of Corporation 110/46a- 110/46h. lawfully Chartered Organization (Nation with in the Nation) *"any church, congregation or society formed for the purpose of religious worship, may become incorporated in the manner following, to wit  by electing or appointing, according to its" usages or customs, at any meeting held for that purpose, two or more of its members as trustees, wardens and vestrymen (or such other officers usages*

*and customs, rules or regulations of such congregation, church or society,) and may adopt a corporate name, by the name so adopted "* **Hurds Revised Statutes 1872 Chapter 32 Statute 35.**     The Most Holy Prophet Noble Drew Ali transferred into the Express Trust after he created the lawful estate (1925-26) / Legal Corporation (1928) in the land. He did it by way of the Settle Land Act of 1925 and later in 1928 through the Revised Hurd Statutes of the Religious Corporation Act of 1872.

On the 17th of October in the year 1928, when the Most Holy Prophet Noble Drew Ali declared us a Nation once again. He wrapped the Moorish Flag a red flag with a five pointed green star in the middle around the youngest adept sister, Sister Grace Berry El, and wrapped the American flag the stars and stripes around the youngest adept brother, Brother M. Morris El, and kissed them both on the forehead raising them up upon the square and declared us a "Nation within a Nation." This is the day we celebrate our true Independence as a People.

The Moorish Science Temple of America is an autonomous Organization, we have a governmental structure in place Supreme Grand Sheik of our Nation, Supreme Grand Council (who interprets our Moorish Jurisprudence Law) the Grand Body (Governors) (who make the National Laws) and Grand Sheiks and Chairman's, who make local laws for their religious societies in their perspective Asiatic States.

## SUBSTANTIVE POINT 4 AMERICAN ECCLESASTICAL LAW OUR LAW ISLAM

On August 1 1928, The Most Holy Prophet by virtue of Public Notice to the free national governments (States) of Illinois and all other free national governments (states) that these presentments come before that our law, the law of the Moorish Science Temple of America deriving its power and authority from the Great Koran of Mohammed to propagate the faith and extend the learning of the Great Prophet of Ali in America. To anoint appoint and consecrate missionaries of the prophet and to establish the faith of Mohammed in America." And upon filing of the affidavit, as hereinafter provided, it shall be and remain a body politic and corporate, by name so adopted,  it shall remain a body politic805ILCS 110/35, FROM Ch. 32, par. 164, Sec.35 http "/www.ilga.gov/legislation_ilcs/ilcs3 asp?ActID ?2281&ChapterID 65.

The R.C.A gives almost no guidance for developing the legal structure and governance of religious corporations. Founders must provide the legal structure from scratch, our civil and

spiritual laws are derived from the Holy Koran of Mohammed and the Grand Advisor and Moderator the Holy Koran of the Moorish Science Temple of America forming the Great Koran of Mohammed, which we revere as the inspired word of The Great God Allah. We are bound by the law of the Most Holy Prophet Noble Drew Ali who instructs in **Article 47 Section 12 Clause 1** The Grand Advisor and Moderator, *"That these holy and divine laws are from the Most Holy Prophet Noble Drew Ali the founder of the uniting of the Moorish Science Temple of America"* and in **Section 13** *"These laws are to be strictly preserved by the members of all the temples of the Moorish Science Temple of America"*, **Section 14"** *Every subordinate Temple of the Grand Major Temple is to form under the principles of love truth peace freedom and justice and to create their own laws and customs in conjunction with the Prophet and the Grand Temple"*

## SUBSTANTIVE POINT 5 CORPORATE SOLE ECCLESIASTICAL OFFICER OFFICE

Whereas Sheik C. Barnes Bey is an ecclesiastical officer and Member of the Moorish Science Temple of America adapted name as Moorish Science Temple of America are a lawfully chartered religious society by virtue of Most Holy Prophet Noble Drew Ali's Express Trust **form 1099 instrument Number 10105905, instrument number:1829244025(6464814), 1823616050(6419888) and Instrument:1829244023(6424812)** I serve many functions in this Divine and National Movement of North America. As a Divine Ministe, Moorish American Moslem, a humble obedient submissive servant of the Great God, The Universal Creator Allah and Disciple of the Most Holy Prophet Noble Drew Ali. As a True Moorish American Moslem Missionary I am always in the capacity of performing my duties that I am charge to do by my Holy and Divine Prophet to anoint appoint and concentrate on the highways and the by ways. This is a way of life that I have been divinely prepared to propagate the Holy Koran of Mohammed and extend the learning of the Great Ali of America. Our religious doctrine instructs **Article 48 Section 6 Clause 1** *"We as a clean and pure nation descended from the inhabitats of Africa, do not desire to amalgamate or marry into the families of the pale skin nations of Europe. Neither serve the gods of their religions, because our forefather are the true and divine founders of the first religious creed, for the redemption and salvation for mankind on earth"*. and." **Article 48 Section 6 Clause 148 Section 7.**"*Therefore we are returning the Church and Christianity back to the European Nations, as it was prepared by their earthly salvation.* " **Article 48**

**Section 8"** "*While we, the Moorish Americans are returning to Islam, which was founded by our forefathers for our earthly and divine salvation.*" **The Grand Advisor and Moderator Rules and** Regulations

SUBSTANTIVE POINT

On every interaction with the agencies of Lancaster County I was functioning in the capacity of my head of state duties as a Governor. It is part of law that we must be in two or more members, in this case the number was two Moorish Officials. On every occasion we presented the county police power with the instruments filed with the county of Lancaster and the indenture agreement and Allodial title that was notarized by a local notary in relations to who the property belonged two and being members of a religious organization the Moorish Science Temple of America. It is our custom and law in our religious society to exercise our right to travel to go from one point to another and stopping along the way if need until we arrive at our destination. The Supreme Courts have held that is an individual right to and seeing that his freedom is being utilized while propagated our religion on the highways and the byways it is a right of religious freedom according to our laws and religious customs "*The right to travel means, of course, the right to go from one place to another It includes the right (1) to start, (2) to go forward on the way, and to stop when the traveler's destination has been reached. We affirm that it includes the right to stop on the way, temporarily, for a legitimate or necessary purpose when that purpose is an immediate incident to travel So it is that the texts and authorities declare that the right to stop when the occasion demands is an incident to the right to travel, a proposition so completely self-evident that no authority is necessary to sustain it, and which we would pronounce irrefutable, had it never heretofore been mentioned But here are some of the authorities which do declare and sustain it.* **2 Blashfield Automobile Law, Perm. Ed., sec. 1191, p. 321; Fulton v. Chouteau County Farmers' Co., 98 Mont. 48, 37 P.2d 1025; Morton v. Mooney, 97 Mont. 1, 33 P.2d 262, 263; Albrecht v. Waterloo Const. Co., 218 Iowa, 1205, 257 N.W. 183.** This claimant is not using our private religious property for unordinary purposes us conducting a driving company with services. The use of the private conveyance is for religious purposes. Utilizing the property for basic religious tasks for survival of ourselves and the survival our kingdom. The courts have held that a citizen has the right to life liberty and the pursuit of happiness "The right of a citizen to travel upon the public highways and to transport his property thereon in the ordinary course of life and business is a common right

which he has under his right to enjoy life and liberty, to acquire and possess property, and to pursue happiness and safety. It includes the right in so doing to use the ordinary and usual conveyances of the day; and under the existing modes of travel includes the right to drive a horse-drawn carriage or wagon thereon, or to operate an automobile thereon, for the usual and ordinary purposes of life and business." **Thompson v. Smith, 155 Va. 367, 154 S.E. 579, 583, 71 A.L.R. 604, 610.** The Supreme Courts recognizes these rights for private citizens and held with no dissenting opinions "There seems to be no dissent among the authorities on this proposition. **See 11 Am. Jur. Constitutional Law, Sec. 329, p. 1135, and the language of the court in Pinkerton v. Verberg, 78 Mich. 573, 44 N.W. 579, 7 L.R.A. 507, 18 Am. St. Rep. , the citizen473. It has been held** "if a state coverts a liberty into a privilege, the citizen can engage in the right in the right with impunity" **Shuttles worth v. Birmingham, 373 US 262".** In islam Allah is the Highest authority in our lives, he is the only one who is authorized to take a liberty that he endowed us with then take it away and attach a fee to it and as Moorish American Moslems, we prefer our law that we are part and partial too, the Divine Constitution and By-Lays Murdock v.Penn., 319 US 105" No State shall convert a liberty into a privilege, License it,and attach a fee to it.  Then The State takes that freedom of life liberty and pursuit of freedom and converts it too a crime. For a crime to exist there must be three elements involved: 1)Mens reas a guilty mind, The sin lies in the wish and the desire not in the act. Grand Advisor and Moderator 2)Actus reas The act of the Crime" traffic infractions are not a crime _ People vs Battle, 50 Cal. App. 3, step 1, 123 Cal. Rptr. 636,639. And three Corpus Deliciti ( Injured body) Where and who is the injured body, who is coming forward and saying that a flesh and blood natural person is harmed? Treaty of Peace and Friendship Article 20 and Article 21, See Treaty Of Peace and Friendship enclosed on the record. I have presented my case sowing violations committed against the first Amendment and Article 6 the supremacy clause Treaty of Peace and Friendship.

I certify that this Affidavit right and exact and is being sent to you on the date below.

Date: 03/18/2019

Attachment: Annexed A 29 pages For the record.

Noble Drew Ali, Disciple in Trust Sheik C. Barnes Bey Grand Governor an Executive Ruler of
the Grand Body

_____

Sheik C.Barnes Bey Grand Governor, an Executive Ruler of the Grand Body

_____

Noble Drew Ali,
Moorish Science Temple No.16
P.O Box 8606
Lancaster, Pennsylvania, 17604

_____

sheikbarnesbey@mstoa16shackamaxon.org
mstoa16.pa.gov@gmail.com

_____

(717)615 0942



**THE LIBRARY OF CONGRESS**
PHOTODUPLICATION SERVICE
WASHINGTON, D.C. 20540-4570

**PHOTODUPLICATION SERVICE**
202-707-5640 (Voice)
202-707-1771 (Fax)
photoduplication@loc.gov (Email)

THIS IS TO CERTIFY that the collections of the Library of Congress contain a publication entitled **THE PUBLIC STATUTES AT LARGE OF THE UNITED STATES OF AMERICA,** volume 8, and that the attached photocopies - the title page, the verso of the title page, and pages 100 through 105 - are a true representation from that work.

THIS IS TO CERTIFY FURTHER, that the work is marked with a Library of Congress stamp that bears the date September 26, 1990.

IN WITNESS WHEREOF, the seal of the Library of Congress is affixed hereto on November 8, 2007.

By: Shirley M. Berry
Acting Chief
Library of Congress
Photoduplication Service

KF50
.U5
vol 8
4th Set

Entered according to act of Congress, in the year 1846, by
CHARLES C. LITTLE & JAMES BROWN,
In the Clerk's office of the District Court of the District of Massachusetts

LIBRARY OF CONGRESS
6
SEP 26 1990
COPY
ORDER DIVISION

Replacement copy
02.5955

BY AUTHORITY OF CONGRESS.

THE

# Public Statutes at Large

OF THE

# UNITED STATES OF AMERICA,

FROM THE

ORGANIZATION OF THE GOVERNMENT IN 1789, TO MARCH 3, 1845.

ARRANGED IN CHRONOLOGICAL ORDER.

WITH

REFERENCES TO THE MATTER OF EACH ACT AND TO THE SUBSEQUENT ACTS
ON THE SAME SUBJECT,

AND

COPIOUS NOTES OF THE DECISIONS

OF THE

# Courts of the United States

CONSTRUING THOSE ACTS, AND UPON THE SUBJECTS OF THE LAWS.

WITH AN

INDEX TO THE CONTENTS OF EACH VOLUME,

AND A

FULL GENERAL INDEX TO THE WHOLE WORK, IN THE CONCLUDING VOLUME.

TOGETHER WITH

The Declaration of Independence, the Articles of Confederation, and
the Constitution of the United States;

AND ALSO,

TABLES, IN THE LAST VOLUME, CONTAINING LISTS OF THE ACTS RELATING TO THE JUDICIARY,
IMPOSTS AND TONNAGE, THE PUBLIC LANDS, ETC.

EDITED BY

RICHARD PETERS, ESQ.,

COUNSELLOR AT LAW.

The rights and interest of the United States in the stereotype plates from which this work is printed, are hereby recognized, acknowledged, and declared by the publishers, according to the provisions of the joint resolution of Congress, passed March 2, 1845.

VOL. VIII.

# BOSTON:

LITTLE, BROWN AND COMPANY.

1867.

KF50
.U5
vol 8
4th Set

Entered according to act of Congress, in the year 1846, by
CHARLES C. LITTLE & JAMES BROWN,
In the Clerk's office of the District Court of the District of Massachusetts



LIBRARY OF CONGRESS
6
SEP 26 1990
COPY
ORDER DIVISION

# TREATY OF PEACE AND FRIENDSHIP

*Between the United States of America, and His Imperial Majesty the Emperor of Morocco.* (a)

January, 1787.

To all Persons to whom these Presents shall come or be made known. WHEREAS the United States of America, in Congress assembled, by their commission bearing date the twelfth day of May, one thousand seven hundred and eighty-four, thought proper to constitute John Adams, Benjamin Franklin, and Thomas Jefferson, their Ministers Plenipotentiary, giving to them, or a majority of them, full powers to confer, treat and negociate with the Ambassador, Minister, or Commissioner of his Majesty the Emperor of Morocco, concerning a treaty of amity and commerce; to make and receive propositions for such treaty, and to conclude and sign the same, transmitting it to the United States in Congress assembled, for their final ratification; and by one other commission, bearing date the eleventh day of March, one thousand seven hundred and eighty-five, did further empower the said Ministers Plenipotentiary, or a majority of them, by writing under their hands and seals, to appoint such agent in the said business as they might think proper, with authority under the directions and instructions of the said Ministers, to commence and prosecute the said negociations and conferences for the said treaty, provided that the said treaty should be signed by the said Ministers: And whereas we, the said John Adams and Thomas Jefferson, two of the said Ministers Plenipotentiary (the said Benjamin Franklin being absent) by writing under the hand and seal of the said John Adams at London, October the fifth, one thousand seven hundred and eighty-five, and of the said Thomas Jefferson at Paris, October the eleventh of the same year, did appoint Thomas Barclay, agent in the business aforesaid, giving him the powers therein, which, by the said second commission, we were authorized to give, and the said Thomas Barclay, in pursuance thereof, hath arranged articles for a treaty of amity and commerce between the United States of America, and his Majesty the Emperor of Morocco, which articles, written in the Arabic language, confirmed by his said Majesty the Emperor of Morocco, and sealed with his royal seal, being translated into the language of the said United States of America, together with the attestations thereto annexed, are in the following words, to wit:

ROYAL SEAL.

In the Name of ALMIGHTY GOD.

This is a Treaty of Peace and Friendship established between us and the United States of America, which is confirmed, and which we have ordered to be written in this book, and sealed with our royal seal, at our court of Morocco, on the twenty-fifth day of the blessed month of Shaban, in the year one thousand two hundred, trusting in God it will remain permanent.

## ARTICLE I.

We declare that both parties have agreed that this treaty, consisting

(a) By "an act making an appropriation for the purpose therein mentioned," passed March 3, 1791, Laws U. S. vol. 1, 214, twenty thousand dollars are appropriated for effecting a negotiation of the treaty with Morocco, September 16, 1836, post, 484.

(100)

of twenty-five articles, shall be inserted in this book, and delivered to the Honorable Thomas Barclay, the agent of the United States, now at our court, with whose approbation it has been made, and who is duly authorized on their part to treat with us concerning all the matters contained therein.

*Emperor's consent to the treaty.*

## ARTICLE II.

If either of the parties shall be at war with any nation whatever, the other party shall not take a commission from the enemy, nor fight under their colours.

*Neither party shall take commission from the enemy of the other.*

## ARTICLE III.

If either of the parties shall be at war with any nation whatever, and take a prize belonging to that nation, and there shall be found on board subjects or effects belonging to either of the parties, the subjects shall be set at liberty, and the effects returned to the owners. And if any goods belonging to any nation, with whom either of the parties shall be at war, shall be loaded on vessels belonging to the other party, they shall pass free and unmolested, without any attempt being made to take or detain them.

*Regulation in case of captures.*

## ARTICLE IV.

A signal or pass shall be given to all vessels belonging to both parties, by which they are to be known when they meet at sea; and if the commander of a ship of war of either party shall have other ships under his convoy, the declaration of the commander shall alone be sufficient to exempt any of them from examination.

*Signal or pass to be given to vessels.*

## ARTICLE V.

If either of the parties shall be at war, and shall meet a vessel at sea belonging to the other, it is agreed, that if an examination is to be made, it shall be done by sending a boat with two or three men only; and if any gun shall be fired, and injury done without reason, the offending party shall make good all damages.

*How vessels shall be examined in time of war.*

## ARTICLE VI.

If any Moor shall bring citizens of the United States, or their effects, to his Majesty, the citizens shall immediately be set at liberty, and the effects restored; and in like manner, if any Moor, not a subject of these dominions, shall make prize of any of the citizens of America, or their effects, and bring them into any of the ports of his Majesty, they shall be immediately released, as they will then be considered as under his Majesty's protection.

*Citizens of the U. S. captured, to be released.*

## ARTICLE VII.

If any vessel of either party shall put into a port of the other, and have occasion for provisions or other supplies, they shall be furnished without any interruption or molestation.

*Vessels wanting supplies, to be furnished.*

## ARTICLE VIII.

If any vessel of the United States shall meet with a disaster at sea, and put into one of our ports to repair, she shall be at liberty to land and re-load her cargo, without paying any duty whatever.

*Provision in case of misfortune.*

## ARTICLE IX.

If any vessel of the United States shall be cast on shore on any part of our coasts, she shall remain at the disposition of the owners, and no one shall attempt going near her without their approbation, as she is

Regulation in case of ship-wreck, and being forced into port.

then considered particularly under our protection; and if any vessel of the United States shall be forced to put into our ports by stress of weather, or otherwise, she shall not be compelled to land her cargo, but shall remain in tranquility until the commander shall think proper to proceed on his voyage.

## ARTICLE X.

Vessels pro-tected in cer-tain cases.

If any vessel of either of the parties shall have an engagement with a vessel belonging to any of the Christian powers within gun shot of the forts of the other, the vessel so engaged shall be defended and protected as much as possible until she is in safety; and if any American vessel shall be cast on shore on the coast of Wadnoon, or any coast thereabout, the people belonging to her shall be protected and assisted, until, by the help of God, they shall be sent to their country.

## ARTICLE XI.

Privileges of vessels in case of war.

If we shall be at war with any Christian power, and any of our vessels sail from the ports of the United States, no vessel belonging to the enemy, shall follow until twenty-four hours after the departure of our vessels; and the same regulation shall be observed towards the Ameri-can vessels sailing from our ports, be their enemies Moors or Christians.

## ARTICLE XII.

Ships of war belonging to U. S. not to be examined.

If any ship of war belonging to the United States shall put into any of our ports, she shall not be examined on any pretence whatever, even though she should have fugitive slaves on board, nor shall the governor or commander of the place compel them to be brought on shore on any pretext, nor require any payment for them.

## ARTICLE XIII.

Ships of war to be saluted.

If a ship of war of either party shall put into a port of the other and salute, it shall be returned from the fort with an equal number of guns, not with more or less.

## ARTICLE XIV.

Commerce on the footing of the most fa-voured nation.

The commerce with the United States shall be on the same footing as is the commerce with Spain, or as that with the most favoured nation for the time being; and their citizens shall be respected and esteemed, and have full liberty to pass and repass our country and seaports when-ever they please, without interruption.

## ARTICLE XV.

Privileges of merchants.

Merchants of both countries shall employ only such interpreters, and such other persons to assist them in their business, as they shall think proper. No commander of a vessel shall transport his cargo on board another vessel; he shall not be detained in port longer than he may think proper; and all persons employed in loading or unloading goods, or in any other labour whatever, shall be paid at the customary rates, not more and not less.

## ARTICLE XVI.

In case of war, prisoners not to be enslaved, but exchanged.

In case of a war between the parties, the prisoners are not to be made slaves, but to be exchanged one for another, captain for captain, officer for officer, and one private man for another; and if there shall prove a deficiency on either side, it shall be made up by the payment of one hundred Mexican dollars for each person wanting. And it is agreed that all prisoners shall be exchanged in twelve months from the time of their being taken, and that this exchange may be effected by a merchant or any other person authorized by either of the parties.

## ARTICLE XVII.

Merchants shall not be compelled to buy or sell any kind of goods but such as they shall think proper; and may buy and sell all sorts of merchandize but such as are prohibited to the other Christian nations.

*Merchants may buy and sell all goods except those prohibited to other Christian nations.*

## ARTICLE XVIII.

All goods shall be weighed and examined before they are sent on board, and to avoid all detention of vessels, no examination shall afterwards be made, unless it shall first be proved that contraband goods have been sent on board, in which case, the persons who took the contraband goods on board, shall be punished according to the usage and custom of the country, and no other person whatever shall be injured, nor shall the ship or cargo incur any penalty or damage whatever.

*Goods to be examined before sent on board, and not after, unless in case of fraud.*

## ARTICLE XIX.

No vessel shall be detained in port on any pretence whatever, nor be obliged to take on board any articles without the consent of the commander, who shall be at full liberty to agree for the freight of any goods he takes on board.

*Vessels not to be detained.*

## ARTICLE XX.

If any of the citizens of the United States, or any persons under their protection, shall have any disputes with each other, the consul shall decide between the parties, and whenever the consul shall require any aid or assistance from our government, to enforce his decisions, it shall be immediately granted to him.

*How disputes shall be settled.*

## ARTICLE XXI.

If a citizen of the United States should kill or wound a Moor, or, on the contrary, if a Moor shall kill or wound a citizen of the United States, the law of the country shall take place, and equal justice shall be rendered, the consul assisting at the trial; and if any delinquent shall make his escape, the consul shall not be answerable for him in any manner whatever.

*How crimes shall be punished.*

## ARTICLE XXII.

If an American citizen shall die in our country, and no will shall appear, the consul shall take possession of his effects; and if there shall be no consul, the effects shall be deposited in the hands of some person worthy of trust, until the party shall appear who has a right to demand them; but if the heir to the person deceased be present, the property shall be delivered to him without interruption; and if a will shall appear, the property shall descend agreeable to that will as soon as the consul shall declare the validity thereof.

*How estates of deceased citizens shall be disposed of.*

## ARTICLE XXIII.

The consuls of the United States of America, shall reside in any seaport of our dominions that they shall think proper; and they shall be respected, and enjoy all the privileges which the consuls of any other nation enjoy; and if any of the citizens of the United States shall contract any debts or engagements, the consul shall not be in any manner accountable for them, unless he shall have given a promise in writing for the payment or fulfilling thereof, without which promise in writing, no application to him for any redress shall be made.

*Consuls and their privileges.*

TREATY WITH MOROCCO.  1787.

### ARTICLE XXIV.

Regulations in
case of war.

If any differences shall arise by either party infringing on any of the articles of this treaty, peace and harmony shall remain notwithstanding, in the fullest force, until a friendly application shall be made for an arrangement, and until that application shall be rejected, no appeal shall be made to arms.  And if a war shall break out between the parties, nine months shall be granted to all the subjects of both parties, to dispose of their effects and retire with their property.  And it is further declared, that whatever indulgences, in trade or otherwise, shall be granted to any of the Christian Powers, the citizens of the United States shall be equally entitled to them.

### ARTICLE XXV.

Duration of
treaty.

This treaty shall continue in full force, with the help of God, for fifty years.

We have delivered this book into the hands of the beforementioned Thomas Barclay, on the first day of the blessed month of Ramadan, in the year one thousand two hundred.

I certify that the annexed is a true copy of the translation made by Isaac Cardoza Nunez, interpreter at Morocco, of the treaty between the Emperor of Morocco and the United States of America.

THOMAS BARCLAY.

### ADDITIONAL ARTICLE.

Grace to the only God.

Vessels of
U. S. to be pro-
tected.

I, the under-written, the servant of God, Taher Ben Abdelkack Fennish, do certify, that His Imperial Majesty, my master, (whom God preserve,) having concluded a treaty of peace and commerce with the United States of America, has ordered me, the better to compleat it, and in addition of the tenth article of the treaty, to declare, "That if any vessel belonging to the United States, shall be in any of the ports of his Majesty's dominions, or within gun-shot of his forts, she shall be protected as much as possible; and no vessel whatever, belonging either to Moorish or Christian Powers, with whom the United States may be at war, shall be permitted to follow or engage her, as we now deem the citizens of America our good friends."

And, in obedience to his Majesty's commands, I certify this declaration, by putting my hand and seal to it, on the eighteenth day of Ramadan,(a) in the year one thousand two hundred.

The servant of the King, my master, whom God preserve,

TAHER BEN ABDELKACK FENNISH.

I do certify that the above is a true copy of the translation made at Morocco, by Isaac Cordoza Nunez, interpreter, of a declaration made and signed by Sidi Hage Taher Fennish, in addition to the treaty between the Emperor of Morocco and the United States of America, which declaration the said Taher Fennish made by the express directions of his Majesty.

THOMAS BARCLAY.

---

(a) The Ramadan of the year of the Hegira 1200, commenced on the 28th June, in the year of our Lord 1786.

Now, KNOW YE, That we, the said John Adams and Thomas Jefferson, Ministers Plenipotentiary aforesaid, do approve and conclude the said treaty, and every article and clause therein contained, reserving the same nevertheless to the United States in Congress assembled, for their final ratification.

In testimony whereof, we have signed the same with our names and seals, at the places of our respective residence, and at the dates expressed under our signatures respectively.

JOHN ADAMS,            (L. S.)
*London, January 25th,* 1787.

THOMAS JEFFERSON,   (L. S.)
*Paris, January 1st,* 1787

**Federal Register**/Vol. 63, No. 240/Tuesday, December 15, 1998/Presidential Documents          **68991**

# Presidential Documents

Executive Order 13107 of December 10, 1998

## Implementation of Human Rights Treaties

By the authority vested in me as President by the Constitution and the laws of the United States of America, and bearing in mind the obligations of the United States pursuant to the International Covenant on Civil and Political Rights (ICCPR), the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), the Convention on the Elimination of All Forms of Racial Discrimination (CERD), and other relevant treaties concerned with the protection and promotion of human rights to which the United States is now or may become a party in the future, it is hereby ordered as follows:

**Section 1.** *Implementation of Human Rights Obligations.* (a) It shall be the policy and practice of the Government of the United States, being committed to the protection and promotion of human rights and fundamental freedoms, fully to respect and implement its obligations under the international human rights treaties to which it is a party, including the ICCPR, the CAT, and the CERD.

(b) It shall also be the policy and practice of the Government of the United States to promote respect for international human rights, both in our relationships with all other countries and by working with and strengthening the various international mechanisms for the promotion of human rights, including, *inter alia,* those of the United Nations, the International Labor Organization, and the Organization of American States.

**Sec. 2.** *Responsibility of Executive Departments and Agencies.* (a) All executive departments and agencies (as defined in 5 U.S.C. 101–105, including boards and commissions, and hereinafter referred to collectively as "agency" or "agencies") shall maintain a current awareness of United States international human rights obligations that are relevant to their functions and shall perform such functions so as to respect and implement those obligations fully. The head of each agency shall designate a single contact officer who will be responsible for overall coordination of the implementation of this order. Under this order, all such agencies shall retain their established institutional roles in the implementation, interpretation, and enforcement of Federal law and policy.

(b) The heads of agencies shall have lead responsibility, in coordination with other appropriate agencies, for questions concerning implementation of human rights obligations that fall within their respective operating and program responsibilities and authorities or, to the extent that matters do not fall within the operating and program responsibilities and authorities of any agency, that most closely relate to their general areas of concern.

**Sec. 3.** *Human Rights Inquiries and Complaints.* Each agency shall take lead responsibility, in coordination with other appropriate agencies, for responding to inquiries, requests for information, and complaints about violations of human rights obligations that fall within its areas of responsibility or, if the matter does not fall within its areas of responsibility, referring it to the appropriate agency for response.

**Sec. 4.** *Interagency Working Group on Human Rights Treaties.* (a) There is hereby established an Interagency Working Group on Human Rights Treaties for the purpose of providing guidance, oversight, and coordination with respect to questions concerning the adherence to and implementation of human rights obligations and related matters.

(b) The designee of the Assistant to the President for National Security Affairs shall chair the Interagency Working Group, which shall consist of appropriate policy and legal representatives at the Assistant Secretary level from the Department of State, the Department of Justice, the Department of Labor, the Department of Defense, the Joint Chiefs of Staff, and other agencies as the chair deems appropriate. The principal members may designate alternates to attend meetings in their stead.

(c) The principal functions of the Interagency Working Group shall include:

(i) coordinating the interagency review of any significant issues concerning the implementation of this order and analysis and recommendations in connection with pursuing the ratification of human rights treaties, as such questions may from time to time arise;

(ii) coordinating the preparation of reports that are to be submitted by the United States in fulfillment of treaty obligations;

(iii) coordinating the responses of the United States Government to complaints against it concerning alleged human rights violations submitted to the United Nations, the Organization of American States, and other international organizations;

(iv) developing effective mechanisms to ensure that legislation proposed by the Administration is reviewed for conformity with international human rights obligations and that these obligations are taken into account in reviewing legislation under consideration by the Congress as well;

(v) developing recommended proposals and mechanisms for improving the monitoring of the actions by the various States, Commonwealths, and territories of the United States and, where appropriate, of Native Americans and Federally recognized Indian tribes, including the review of State, Commonwealth, and territorial laws for their conformity with relevant treaties, the provision of relevant information for reports and other monitoring purposes, and the promotion of effective remedial mechanisms;

(vi) developing plans for public outreach and education concerning the provisions of the ICCPR, CAT, CERD, and other relevant treaties, and human rights-related provisions of domestic law;

(vii) coordinating and directing an annual review of United States reservations, declarations, and understandings to human rights treaties, and matters as to which there have been nontrivial complaints or allegations of inconsistency with or breach of international human rights obligations, in order to determine whether there should be consideration of any modification of relevant reservations, declarations, and understandings to human rights treaties, or United States practices or laws. The results and recommendations of this review shall be reviewed by the head of each participating agency;

(viii) making such other recommendations as it shall deem appropriate to the President, through the Assistant to the President for National Security Affairs, concerning United States adherence to or implementation of human rights treaties and related matters; and

(ix) coordinating such other significant tasks in connection with human rights treaties or international human rights institutions, including the Inter-American Commission on Human Rights and the Special Rapporteurs and complaints procedures established by the United Nations Human Rights Commission.

(d) The work of the Interagency Working Group shall not supplant the work of other interagency entities, including the President's Committee on the International Labor Organization, that address international human rights issues.

**Sec. 5.** *Cooperation Among Executive Departments and Agencies.* All agencies shall cooperate in carrying out the provisions of this order. The Interagency Working Group shall facilitate such cooperative measures.

**Sec. 6.** *Judicial Review, Scope, and Administration.* (a) Nothing in this order shall create any right or benefit, substantive or procedural, enforceable by any party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

(b) This order does not supersede Federal statutes and does not impose any justiciable obligations on the executive branch.

(c) The term "treaty obligations" shall mean treaty obligations as approved by the Senate pursuant to Article II, section 2, clause 2 of the United States Constitution

(d) To the maximum extent practicable and subject to the availability of appropriations, agencies shall carry out the provisions of this order.

THE WHITE HOUSE,
*December 10, 1998.*

[FR Doc 98–33348
Filed 12–14–98, 8 45 am]
Billing code 3195–01–P

should be admitted to membership in the United Nations,[81]

*Having considered* the application for membership of the Republic of Mali,[82]

*Decides to* admit the Republic of Mali to membership in the United Nations.

*876th plenary meeting,*
*28 September 1960.*

**1492 (XV). Admission of the Federation of Nigeria to membership in the United Nations**

*The General Assembly,*

*Having received* the recommendation of the Security Council of 7 October 1960 that the Federation of Nigeria should be admitted to membership in the United Nations,[83]

*Having considered* the application for membership of the Federation of Nigeria,[84]

*Decides* to admit the Federation of Nigeria to membership in the United Nations.

*893rd plenary meeting,*
*7 October 1960.*

**1495 (XV). Co-operation of Member States**

*The General Assembly,*

*Deeply concerned* by the increase in world tensions,

*Considering* that the deterioration in international relations constitutes a grave risk to world peace and co-operation,

*Conscious* that both in the General Assembly and in the world at large it is necessary to arrest this trend in international relations and to contribute towards greater harmony among nations irrespective of the differences in their political and economic systems,

1. *Urges* that all countries, in accordance with the Charter of the United Nations, refrain from actions likely to aggravate international tensions;

2. *Reaffirms the conviction* that the strength of the United Nations rests on the co-operation of its Member States which should be forthcoming in full measure so that the Organization becomes a more effective instrument for the safeguarding of peace and for the promotion of the economic and social advancement of all peoples;

3. *Urges further* that immediate and constructive steps should be adopted in regard to the urgent problems concerning the peace of the world and the advancement of its peoples;

4. *Appeals* to all Member States to use their utmost endeavours to these ends.

*907th plenary meeting,*
*17 October 1960.*

**1503 (XV). Report of the International Atomic Energy Agency**

*The General Assembly*

*Takes note* of the report of the International Atomic

Energy Agency to the General Assembly for the year 1959-1960.[85]

*943rd plenary meeting,*
*12 December 1960.*

**1513 (XV). Report of the Security Council**

*The General Assembly*

*Takes note* of the report of the Security Council to the General Assembly covering the period from 16 July 1959 to 15 July 1960.[86]

*943rd plenary meeting,*
*12 December 1960.*

**1514 (XV). Declaration on the granting of independence to colonial countries and peoples**

*The General Assembly,*

*Mindful* of the determination proclaimed by the peoples of the world in the Charter of the United Nations to reaffirm faith in fundamental human rights, in the dignity and worth of the human person, in the equal rights of men and women and of nations large and small and to promote social progress and better standards of life in larger freedom,

*Conscious* of the need for the creation of conditions of stability and well-being and peaceful and friendly relations based on respect for the principles of equal rights and self-determination of all peoples, and of universal respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race, sex, language or religion,

*Recognizing* the passionate yearning for freedom in all dependent peoples and the decisive role of such peoples in the attainment of their independence,

*Aware* of the increasing conflicts resulting from the denial of or impediments in the way of the freedom of such peoples, which constitute a serious threat to world peace,

*Considering* the important role of the United Nations in assisting the movement for independence in Trust and Non-Self-Governing Territories,

*Recognizing* that the peoples of the world ardently desire the end of colonialism in all its manifestations,

*Convinced* that the continued existence of colonialism prevents the development of international economic co-operation, impedes the social, cultural and economic development of dependent peoples and militates against the United Nations ideal of universal peace,

*Affirming* that peoples may, for their own ends, freely dispose of their natural wealth and resources without prejudice to any obligations arising out of international economic co-operation, based upon the principle of mutual benefit, and international law,

*Believing* that the process of liberation is irresistible and irreversible and that, in order to avoid serious crises, an end must be put to colonialism and all practices of segregation and discrimination associated therewith,

*Welcoming* the emergence in recent years of a large number of dependent territories into freedom and independence, and recognizing the increasingly powerful trends towards freedom in such territories which have not yet attained independence,

---

[81] *Ibid.*, document A/4514.
[82] *Ibid.*, document A/4512.
[83] *Ibid.*, document A/4533.
[84] *Ibid.*, document A/4527.
[85] *Annual report of the Board of Governors to the General Conference, 1 July 1959-30 June 1960,* Vienna, July 1960 (A/4531 and Corr.1 and Add.1).

[86] *Official Records of the General Assembly, Fifteenth Session, Supplement No. 2* (A/4494).

*Convinced* that all peoples have an inalienable right to complete freedom, the exercise of their sovereignty and the integrity of their national territory,

*Solemnly proclaims* the necessity of bringing to a speedy and unconditional end colonialism in all its forms and manifestations;

And to this end

*Declares* that:

1. The subjection of peoples to alien subjugation, domination and exploitation constitutes a denial of fundamental human rights, is contrary to the Charter of the United Nations and is an impediment to the promotion of world peace and co-operation.

2. All peoples have the right to self-determination; by virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development.

3. Inadequacy of political, economic, social or educational preparedness should never serve as a pretext for delaying independence.

4. All armed action or repressive measures of all kinds directed against dependent peoples shall cease in order to enable them to exercise peacefully and freely their right to complete independence, and the integrity of their national territory shall be respected.

5. Immediate steps shall be taken, in Trust and Non-Self-Governing Territories or all other territories which have not yet attained independence, to transfer all powers to the peoples of those territories, without any conditions or reservations, in accordance with their freely expressed will and desire, without any distinction as to race, creed or colour, in order to enable them to enjoy complete independence and freedom.

6. Any attempt aimed at the partial or total disruption of the national unity and the territorial integrity of a country is incompatible with the purposes and principles of the Charter of the United Nations.

7. All States shall observe faithfully and strictly the provisions of the Charter of the United Nations, the Universal Declaration of Human Rights and the present Declaration on the basis of equality, non-interference in the internal affairs of all States, and respect for the sovereign rights of all peoples and their territorial integrity.

*947th plenary meeting,*
*14 December 1960.*

### 1592 (XV).   The situation in the Republic of the Congo

*The General Assembly,*

*Having considered* the item entitled "The situation in the Republic of the Congo",

*Noting* that the previous resolutions of the Security Council and the General Assembly on this subject are still in effect,

*Decides* to keep this item on the agenda of its resumed fifteenth session.

*958th plenary meeting,*
*20 December 1960.*

\*
\*   \*

## *Note*

### Appointment of the Peace Observation Commission (item 18)

At its 960th plenary meeting on 20 December 1960, the General Assembly decided to reappoint, for the calendar years 1961 and 1962, the present members of the Peace Observation Commission. The Commission is therefore composed as follows: CHINA, CZECHOSLOVAKIA, FRANCE, HONDURAS, INDIA, IRAQ, ISRAEL, NEW ZEALAND, PAKISTAN, SWEDEN, UNION OF SOVIET SOCIALIST REPUBLICS, UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND, UNITED STATES OF AMERICA and URUGUAY.